**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID CHURCHILL,

              Plaintiff(s),

    v.

WINTER CHEVROLET, ET AL.,

              Defendant(s).

_____/

No. C-04-0489 JCS

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY ADJUDICATION OF
COUNTERCLAIM FOR CAUSATION OF
INTENTIONAL EMOTIONAL DISTRESS AND
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [Docket Nos. 116, 145]**

**I.      INTRODUCTION**

On Friday, May 6, 2005, at 9:30 a.m., the following motions came on for hearing: 1) Plaintiff's Motion for Summary Adjudication of Counterclaim for Intentional Causation of Emotional Distress ("Plaintiff's Motion"); and 2) Defendants' Motion for Summary Judgment ("Defendants' Motion").  For the reasons stated below, Plaintiff's Motion is GRANTED.  Defendants' Motion is GRANTED in part and DENIED in part.[1]

**II.     BACKGROUND**

    **A.      Facts**

        **1.      Churchill's Employment by Winter Chevrolet**

Churchill was employed as General Manager for Winter Chevrolet from March 2000 to July 7, 2003.  Joint Statement of Undisputed Material Facts Re Counterdefendant David Churchill's Motion for Summary Adjudication ("Joint Statement (Plaintiff's Motion)"), No. 11.  Rose Winter is a 71-year old

---

[1]  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

widow and the Owner and President of Winter Chevrolet.  Counterclaimant Rose Winter's Separate Statement of Undisputed Facts and Genuine Issues of Fact in Opposition to Counterdefendant David Churchill's Motion for Summary Adjudication ("Defendants' Separate  Statement (Plaintiff's Motion)"), No. 1 (citing Declaration of Rose Winter in Support of Counterclaimant Rose Winter's Opposition to Counterdefendant David Churchill's Motion for Summary Adjudication ("Winter Decl.") ¶ 1) .

Prior to his employment with Winter Chevrolet, Churchill was employed by Honda of Oakland as a general sales manager.  Joint Statement of Undisputed Material Facts Re Defendants Winter Chevrolet Company, Inc. and Rose Winter's Motion for Summary Judgment ("Joint Statement (Defendants' Motion)"), No. 1.  His compensation from Honda of Oakland in 1999 was $560,450.00.  *Id.*, No. 2.  In the fall of 1999, Churchill entered into an agreement with Melody Toyota to become its general manager.  *Id.*, No. 4.  In late November or early December, Churchill informed Honda of Oakland that he would be leaving to accept the position at Melody Toyota.  *Id.*, No. 5.

In the meantime, Churchill was also negotiating for a position as a general manager with Winter Chevrolet.  *Id.*, Nos. 6-33.  These negotiations began in October, 1999 and included several calls and meetings between Churchill and Winter.  *Id.*, No. 6.  According to Churchill, in one of the meetings, Winter "did tell [him] her business was in a trust and she would have to research it and that this is what would take the time  – she would have to research how [Churchill could] become an equity partner and how [they] could put this partnership together."  Declaration of Richard M. Rogers in Opposition to Defendants' Motion for Summary Judgment ("Rogers Decl. (Defendants' Motion)"), Ex. 5 (Churchill Depo.) at 128.  By mid-December, these negotiations had progressed to the point that Churchill notified Honda of Oakland that he had decided not to take the position with Melody Toyota and that he wanted to stay at Honda of Oakland.  *Id.*, No. 8.

In late January 2000, Winter asked Churchill to meet with her accountants, Andy Engilis and Don Payne, which Churchill did.  *Id.*, Nos. 10, 12.  Engilis and Payne had provided tax advice and general business consultation to Winter Chevrolet and Rose Winter for a number of years, and Winter valued their opinions and knowledge of the car dealership business.  *Id.*, No. 11.  In the January meeting, Engilis and Payne asked Churchill about his background and qualifications.  *Id.*, No. 13.  They also discussed

compensation, including Churchill's desire to obtain an equity interest in the dealership. *Id.*, No. 14.

Churchill described the conversation with Engilis in this meeting as follows:

> A:    . . . [Engilis] was concerned that  –  we talked a little about how I would be getting the stock . . . .
>
> . . .
>
> Q:    And what did he say on that particular subject?
>
> A:    His concern was that if we're going to take on a partnership, that the relationship works. He thought that there ought to be a buy-sell agreement.  We talked about me hav[ing] the first right of refusal, and also we talked about me being protected and being able to purchase at the current value, not the future value of the business.  He agreed that that's the only way to do these deals.
>
> Q:    So, did he bring up purchasing at current value, or did you bring that up?
>
> A:    I brought that up.

Rogers Decl. (Defendants' Motion), Ex. 5 (Churchill Depo.) at 136-37.

Around the same time, on January 25, 2000, Churchill faxed a proposed contract to Don Payne. Joint Statement (Defendants' Motion), No. 17.  One of the requirements of the proposed agreement was for "20% ownership of Winter Chevrolet - Honda within 6 months of hire date."  Cliffe Decl., Ex. B (Churchill Depo., Ex. 9).  It did not, however, contain a buy-sell provision.  Joint Statement (Defendants' Motion), No. 19.  In response, Winter asked Payne to put together the proposed terms of Churchill's compensation plan. *Id.*, No. 20.  Payne did so and, after obtaining Winter's approval, faxed a memo with deal points to Churchill on February 18, 2000 ("February 18, 2000 Proposal"). *Id.*, No. 22.

The February 18, 2000 Proposal contained nine paragraphs, which provided: 1) a base salary of $8,000.00 per month; 2) one Company vehicle, plus gas; 3) a monthly bonus of 15% of net profits, payable 10% monthly with the balance payable at the end of the year; 4) a guaranteed minimum of $15,000.00 per month for the first three months of employment; 5) an annual bonus based on net profit ; 6) a required purchase of 4% of corporate stock "at inception"; 7) an additional annual bonus of 4% of corporate stock for 4 years; 8) a buy-sell agreement in the event of Winter's death or disability; and 9) an

**United States District Court**
For the Northern District of California

1   annual bonus for Rose Winter in the amount of 25% of net profit.  *Id.*, No. 23; Cliffe Decl., Ex.  B

2   (Churchill Depo., Ex. 10) &  Ex. A (Winter Depo., Ex. 9).[2]  The proposal did not contain signature lines.

3           Shortly after faxing the February 18, 2000 Proposal to Churchill, Payne decided to add another

4   provision to the proposed compensation plan regarding Winter's ability to transfer the corporate stock

5   referenced in paragraphs 6 through 8 of the initial proposal.   Joint Statement (Defendants' Motion), No.

6   25. That provision states as follows:

7                Rose is currently in the process of obtaining appraisal on the dealership.
             Upon completion she will acquire 49% of stock which is now held by trusts
8            created at her husband's death.  She is the trustee of the trusts.  No stock
             can be transferred to David until the 49% is acquired by Rose.

9

10  *Id.*, No. 27.  At his deposition, Don Payne testified as follows concerning the reasons for adding this

11  provision:

12               In this several-day period in which we were trying to put this together, the
             employment arrangement together, and after Rose had provided to me a
13           document which, I believe, is this Exhibit 9 you provided, it occurred to me
             that there could possibly be delays in getting the stock transferred from the
14           trust to Rose in order to sell and provide the shares to David.  We needed
             to value the stock before we could transfer shares to him.  We still needed
15           to have an appraisal done for those shares, and I was concerned that it
             might take a while for that transfer to occur.  And I didn't want David to
16           think that he was going to get those shares immediately, I wanted everyone
             to be aware that it might take some time, so that's the reason I added that
17           provision.

18  Cliffe Decl., Ex. C (Payne Depo.) at 17.  He went on to testify that "[a]t that time there was nothing [he]

19  was aware of in the trust that would create a problem in transferring the stock." *Id.* at 20.  On February 23,

20  2000, Payne faxed the new proposal ("the February 23, 2000 Proposal"), which did not have signature

21  lines, to Churchill. *Id.*, No. 28, 30.[3]

22  _____

23       [2]  There appear to be two versions of the February 18, 2000 Memorandum – one attached as Exhibit
24  9 to the Winter deposition transcript and the other attached as Exhibit 10 to Churchill's deposition transcript.
    The two documents are identical except for paragraph 6.  The version attached to the Churchill deposition
25  transcript provides for "required purchase of 4% at inception" while the version attached to the Winter
    deposition transcript provides for "required purchase of 4% after six months."  This discrepancy is not material,
26  however, to any of the issues raised in the Motions.

27       [3]  The Court is unable to find in the record any document that matches the description of the February
    23, 2000 Proposal – that is, a document containing all ten paragraphs ultimately included in the signed
28  agreement but no signature lines.  Nonetheless, the parties have stipulated that such a document was sent to
    Churchill on February 23, 2000.

4

Subsequently, the parties signed the February 23, 2000 Proposal, in finalized form (hereinafter, "General Manager Pay Plan"). Cliffe Decl., Ex. A (Winter Depo., Ex. 8). The agreement is dated February 28, 2000. *Id.* However, Churchill testified in his deposition that he signed the agreement on March 6, 2000 and back-dated his signature to February 28, 2000 at Winter's instruction. Rogers Decl. (Defendants' Motion), Ex. 5 (Churchill Depo.) at 198.

The "Buy-Sell" provision in the General Manager Pay Plan states as follows:

> Buy-Sell Agreement for death, disability or separation from service. Within first four years, Rose buys back stock at David's purchase price. Thereafter at appraised value. David has the right to buy Rose's stock at appraised value in the event of her death or disability. David has the right of first refusal if Rose decides to sell.

Declaration of Joshua J. Cliffe in Support of Defendants Winter Chevrolet Company, Inc. and Rose Winter's Motion for Summary Judgment ("Cliffe Decl."), Ex. A (Winter Depo., Ex. 8 (General Manager Pay Plan, ¶ 8)). Churchill testified in his deposition that he interpreted the words "appraised value" in the third sentence to mean the appraised value at the time of the buy-back but that the words "appraised value" in the fourth sentence meant the value at which the stocks were appraised in 2000. Rogers Decl. (Defendants' Motion), Ex. 5 (Churchill Depo.) at 199-201. Churchill testified that his interpretation was based on his conversation with Payne and Engilis in the January meeting discussed above.

On March 1, 2000, Churchill terminated his employment with Honda of Oakland. Cliffe Decl., Ex. B (Churchill Depo., Ex. 13). He began his employment with Winter Chevrolet in the second week of March, 2000. Joint Statement (Defendants' Motion), No. 38.

### 2. The August 27 Agreements

In March or April 2000,[4] Winter consulted with her estate attorney, Beverly Lavin, regarding the transfer of stock to David Churchill from the Q Tip trust of which she was trustee.[5] *Id.*, No. 39. In a letter

---

[4] Although Plaintiff has stipulated to this date in the Joint Statement, he states in his Opposition that it is "highly questionable." Plaintiff does not, however, present any evidence that Winter did not ask for this advice in March or April.

[5] According to Defendants, 51% of the corporate stock was controlled by Rose Winter pursuant to a Survivor's Trust established by her late husband while the remaining 49% was controlled by a Q Tip trust, also created by Winter's late husband. Defendants Winter Chevrolet Company, Inc. and Rose Winter's Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Defendants' Separate Statement"), Nos. 3-4. Defendants further assert that Winter was the trustee and

United States District Court

For the Northern District of California

1   dated August 28, 2000, Lavin advised Winter she would likely violate her fiduciary duty to her

2   stepdaughter if she transferred stock from the Q Tip trust to Churchill.  Cliffe Decl., Ex. A (Winter Depo.,

3   Ex. 23).  Soon after receiving Lavin's opinion, Winter retained a second attorney, Halbert Rasmussen, to

4   advise her on the legal implications of transferring the corporate stock to Churchill.  Joint Statement

5   (Defendants' Motion), No. 40.  In a memorandum dated September 14, 2000, Rasmussen too advised

6   that the transfer of stock to Churchill could constitute a breach of Winter's fiduciary duty to the Q Tip trust.

7   *Id.*, No. 41; *see also* Cliffe Decl., Ex. A (Winter Depo., Ex. 22).

8       Based on the advice of her attorneys, Winter did not immediately transfer the corporate stock as

9   originally planned.  Joint Statement (Defendants' Motion), No. 42.  According to Churchill, in December

10  2000, he discussed the question of the stock transfer with Winter, Engilis and Payne.  Cliffe Decl., Ex. B

11  (Churchill Depo.) at 211.  Churchill stated that Payne "mentioned to me that they were going to have to

12  take an alternative look on how they were going to be able to issue me the shares."  *Id.*  According to

13  Churchill, Payne said that "[i]t doesn't look like we can do it the way that we initially planned to do it."  *Id.*

14  at 212.  Churchill testified further that Payne did not explain the reasons for the problem and he did not ask.

15  *Id.*

16      According to Payne, during the remainder of 2000 and into 2001, he and Winter were "looking for

17  some alternative ways to transfer ownership . . . ."  Cliffe Decl., Ex. C (Payne Depo.) at 35.   In May

18  2001, Churchill retained an attorney, Michael Dawe, to represent him in his discussions with Winter

19  Chevrolet.  Joint Statement (Defendants' Motion), No. 45.  Dawe sent a letter, dated May 11, 2001,

20  demanding transfer of the stock and threatening suit.  *Id.*, No. 46; *see also* Cliffe Decl., Ex. D (Dawe

21  Depo., Ex. 5).   Payne then retained an estate attorney, Irving Joseph, to assist in structuring a deal and

22  negotiate with Dawe.  *Id.*, No. 48.

23      Joseph met with Payne and Engilis on June 21, 2001 to discuss the problems relating to the transfer

24  of Churchill's shares.  *Id.*, No. 49.  At the meeting, he proposed a plan to effectuate the stock transfer,

25  _____

26  beneficiary of the Q Tip trust and that Winter's step-daughter, Patricia Winter, was also a beneficiary of the
    Q Tip trust.  Id., No. 5.  Plaintiff objects to these assertions on the basis that the evidence on which it is based
27  – the Payne deposition testimony quoted above (see fn. 3) does not support these assertions.  However,
    Plaintiff does not actually state that these assertions are inaccurate.  The Court need not resolve this dispute
28  because its holding does not rely on  these particular facts.

**United States District Court**
For the Northern District of California

1    which he memorialized in a memorandum dated June 27, 2001.  Declaration of Irving B. Joseph in Support

2    of Defendants' Motion for Summary Judgment ("Joseph Decl."), Ex. A.  Joseph devised a plan in which

3    Winter would not acquire the full 49% of the corporate stock in the Q Tip trust, as originally planned, but

4    rather, would acquire 20% of the stock from the Q Tip trust at fair market value and would state in a

5    corporate resolution that this sale would benefit the trust because Churchill was an asset who would drive

6    up the value of the corporation.  Joint Statement (Defendants' Motion), No. 51; *see also* Cliffe Decl., Ex.

7    F (Joseph Depo.) at 15-17.

8           Joseph then drafted documents to effectuate the General Manager Pay Plan, including: 1) a Stock

9    Purchase and Option Agreement; 2) Stock Redemption Agreement; 3) Cross-Purchase Agreement; and 4)

10   Consent of Spouse.  Joint Statement (Defendants' Motion), No. 55; Cliffe Decl. (Defendants' Motion), Ex.

11   F (Joseph Depo., Ex. 103).  On August 27, 2001, Churchill was forwarded these documents ("the August

12   27 Agreements") to sign.  Defendants' Separate Statement (Plaintiff's Motion), Nos. 13, 15.

13          Churchill, however, declined to sign the agreements.  *Id.*  According to Joseph, Dawe discussed

14   with him the main reason for Churchill's rejection in a telephone conversation on November 20, 2001.

15   Joseph described the conversation as follows:

16              On November 20, 2001, I spoke with Michael Dawe by telephone.  He
                stated that David Churchill's biggest concern was that the purchase price
17              for the remainder at the other end [ie., in the case of Winter's death or
                disability] was going to be so large as to make it prohibitive for him to make
18              the buy and that it was counterproductive for Churchill to drive up the value
                of the business just to have to purchase at the other end.  I explained that it
19              would breach Winter's fiduciary duties to sell the corporate stock for less
                than fair market value.

20

21   Joseph Decl., ¶ 8.  Similarly, in a letter dated December 12, 2001, Dawe stated:

22              [I]t would make no sense for Mr. Churchill to be dedicating himself at
                work only to assure that his eventual purchase price of the dealership
23              would continue to increase without any correlative benefit to him.
                Additionally, despite the terms of the original agreements, Ms. Winter is
24              apparently unable to acquire the stock for her sole ownership, and to bind
                the Trust to a purchase price less than a future FMV would be a breach of
25              fiduciary duty.

26   Cliffe Decl., Ex. D (Dawe Depo., Ex. 15).

27

28

United States District Court

For the Northern District of California

### 3. Negotiation of the March 2003 Employment Agreement

On December 21, 2001, Churchill met with Payne and Engilis and proposed an alternative arrangement to replace the General Manager Pay Plan.  Joint Statement (Defendants' Motion), No. 63-64.  Churchill proposed that his pay be increased in the form of large annual bonuses equivalent to the value of stock that he was originally promised.  *Id.*, No. 65.  In addition, he proposed that he obtain a right to purchase the stock in the event of Winter's death, disability, or sale of the dealership, to be funded by a life insurance policy on Winter with Churchill as the beneficiary.  *Id.*, No. 66.

Payne subsequently worked to put together the terms of an employment agreement to reflect the compensation plan proposed by Churchill.  *Id.*, No. 68.  He also drafted preliminary deal points for a Right of First Refusal (also referred to as the "buy/sell agreement") to purchase corporate stock.  *Id.*, No. 69.  However, Payne focused on completing the employment agreement first, because he thought it was more urgent than the Right of First Refusal.  *Id.*, No. 71.  Payne discussed Churchill's proposal with Winter, who advised Payne that she did not object to increased bonuses in lieu of stock but that she would not agree to a buy/sell agreement funded by a life insurance policy.  *Id.*, No. 72.  On March 12, 2003, a new employment agreement (the "2003 Employment Agreement") was signed by the parties.  Joint Statement (Plaintiff's Motion), No. 14.

According to Churchill, in late June 2003, Winter told him that she would not agree to any buy/sell agreement.   Rogers Decl. (Defendants' Motion), Ex. 5 (Churchill Depo.) at 243-44.  Around this time, Churchill decided to leave Winter Chevrolet.  Cliffe Decl,. Ex. B (Churchill Depo.) at 55.  The Right of First Refusal was never finalized.

### 4. Departure of Jason Kim from Winter Chevrolet

Around late May 2003, the General Sales Manager, Jason Kim, left Winter Chevrolet to work at another dealership, Broadway Volkswagen.  Declaration of Richard M. Rogers in Support of Plaintiff's Motion for Summary Adjudication of Counterclaim for Intentional Causation of Emotional Distress ("Rogers Decl. (Plaintiff's Motion)"), Ex. 2 (Winter Depo.) at 227 & Ex. 3 (Churchill Depo.) at 93-94.  Churchill testified at his deposition that he told Kim about the opening  after Kim became dissatisfied with various developments at Winter Chevrolet and asked Churchill to help him find another job.  Rogers Decl. (Plaintiff's Motion), Ex. 3 (Churchill Depo.) at 94-95.   Soon after Kim left, a number of other managers

United States District Court

For the Northern District of California

1  left Winter Chevrolet, apparently to work for Kim at the other dealership.  Rogers Decl. (Plaintiff's

2  Motion), Ex. 2 (Winter Depo.) at 228-30.  Rose Winter testified that she believed Churchill was

3  responsible for the "orchestration of those managers leaving."  *Id*. at 230.  Elsewhere in her deposition,

4  Winter clarified that she believed "Churchill's orchestration was limited to assisting Mr. Kim to leave," and

5  that Jason Kim orchestrated the departure of the other managers who went to work for Broadway

6  Volkswagen.  *Id*. at 242-43.

### 5.      Interactions Between Churchill and Winter

8        In the summer of 2003, labor negotiations occurred between the Teamsters and the Machinists

9  Unions for a new collective bargaining agreement.  Joint Statement (Plaintiffs Motion), No. 39.  On July 3,

10  2003, the unionized employees went on strike.  *Id.*, No. 40.  Among the strikers was a manager of Winter

11  Chevrolet, Ray Shields.  Rogers Decl. (Plaintiff's Motion), Ex. 2 (Winter Depo.) at 276.  According to

12  Winter, she and Churchill agreed that Shields should remain at work during the strike.  *Id*. at 277.

13  Sometime within a day or two of July 3, Winter and Churchill met with Shields and some other managers

14  and told them they expected the managers to return to work.  *Id.*  Winter also gave Shields a letter

15  demanding he return to work within 24 hours or be terminated.  *Id*. at 285.  When Shields continued to

16  take part in the strike, he was fired.  *Id*.

17        Defendants assert that on July 5, 2003, two days after the strike began, Churchill presented Winter

18  with a completely new Employment Agreement and demanded "Sign this, or I'm walking."  Joint Statement

19  (Plaintiffs Motion), No. 39.   This proposed contract included a buy-sell provision under which Churchill,

20  no later than 2010, would buy Winter Chevrolet for either the 2000 appraised value or 50% of the

21  appraised value at the time of purchase.  Cliffe Decl., Ex. C (Churchill Decl., Ex. 20).  Defendants assert

22  that even though Winter was shocked by Churchill's aggressive behavior, she responded that she wanted

23  Churchill to stay and that he should take a few days to think about what he was doing.  Joint Statement

24  (Plaintiff's Motion), No. 44.  She also told Churchill that she could not sign the contract.  *Id.*, No. 45.

25        On July 7, 2003, Winter and Churchill spoke on the phone and Churchill indicated that he had

26  decided to quit.  *Id.*, Nos. 46, 47.  Winter stated that she would have someone pick up the company car

27  from him, however he insisted that he would return the car himself later that evening.  *Id.*, No. 47.  Around

28

United States District Court

For the Northern District of California

1  8:00 p.m., Churchill returned his car and spoke face-to-face with Winter in what is characterized by

2  Defendants as a series of threats.

3        In her deposition, Winter stated that Churchill was standing over her desk and she

4  testified as follows:

5      A:   . . . He was very menacing, telling me that he was going to definitely be taking me to court,
and he did not care.  He said, "I'm a 39–a 39 year-old guy.  But you know what?" he said,

6  "You're a little old lady; but when we go to court," he said "I believe that, you know,
I'll–I'll prevail," words to that effect.  And then he said, "I'm willing to spend a hundred

7  thousand dollars to take you to a court–to take you to a trial, but I'm definitely going to
pursue this.  And I will even involve your stepdaughter in this because I know that she's

8  sued you before on issues with the trust."

9  . . .

    And he said to me, "Go ahead and wipe your tears from your eyes.  Grab a tissue."

10  . . .

11      . . . and he told me he had a team of attorneys.

12  Rogers Decl. (Plaintiff's Motion), Ex. 2 (Winter Depo.) at 92-93; Joint Statement (Plaintiff's Motion), No.

13  50.  Defendants allege that Churchill also impugned Winter's ability to run her business, stating, "If you try

14  to general manage these stores, you will fail."  Rogers Decl. (Plaintiff's Motion), Ex. 1 (Defendant Rose

15  Winter's Supplemental Response to 1st Set of Interrogatories), at 8.  Also, Defendants assert that Churchill

16  expressed pleasure in Winter's distress, saying "I love to see you looking like this."  *Id.*  After Churchill left

17  her office, Winter wrote notes on her desk calendar to describe how Churchill threatened her.  Joint

18  Statement (Plaintiff's Motion), No. 51.

19        Plaintiff alleges that during the interim period between the July 7, 2003 confrontation and the filing

20  of this action, he filed a wage claim with the Labor Commission.  Declaration of David Churchill in Support

21  of Plaintiff's Motion for Summary Adjudication of Counterclaim for Intentional Causation of Emotional

22  Distress ("Churchill Decl. (Plaintiff's Motion") ¶ 4.  In a letter dated July 17, 2003, Churchill notified

23  Winter and stated "[I]f I am not paid in full, or given an agreeable time when I will be paid, I will file the

24  attached claim with the California Labor Board."  Churchill Decl. (Plaintiff's Motion), Ex. 2 (July 17 Letter

25  from Churchill to Winter).

26        **6.    Statement Made to Strikers**

27        Defendants assert that immediately after threatening Winter, Churchill spoke with a group of

28  strikers and caused them to become increasingly hostile.  Joint Statement (Plaintiff's Motion), No. 54.

According to Marc Robinson, an employee of Winter Chevrolet who was picketing outside of Winter Chevrolet on the evening of July 7, 2003, as Churchill left the premises after his encounter with Winter, he came up to the picketers and said to them: "I quit[.] I couldn't take it anymore to see you guys out here like this."  Rogers Decl. (Plaintiff's Motion), Ex. 4 (Declaration of Marc Robinson), ¶ 4.  Robinson states further in his declaration that he thought "the resignation of Churchill in support of the strikers put more pressure on Rose Winter and the dealership because now she had no one to help her out during the strike." *Id.* at ¶ 5.  It is undisputed that Winter was not present when Churchill made the comment to the strikers.

Up until July 7, 2003, there were no incidents of violence.  Joint Statement (Plaintiff's Motion), No. 54.  However, after Churchill's remarks, the strikers turned off Winter Chevrolet's water supply, let the air out of a customer's tires, threatened customers they would smash their windows, and vandalized a vehicle on Winter Chevrolet's property. *Id.,* Nos. 54-58.

### 7.      Labor Commission Charges

According to Winter, during July or August 2003, a number of charges were filed with the labor commissioner against Winter Chevrolet.  Rogers Decl. (Plaintiff's Motion), Ex. 2 (Winter Depo.) at 290.  One of the individuals who complained to the labor commissioner was Ray Shields. *Id.*  Winter testified that she saw Churchill talking to Shields in the labor commissioner's office when she appeared to respond to the charges. *Id.*  Winter believed Churchill encouraged Shields to file the complaint. *Id.*  Winter testified that many of the managers who left to work for Jason Kim also filed wage claims with the labor commissioner. *Id.* at 295-96.  Winter testified that she believed Churchill encouraged these managers to bring these wage claims as a form of harassment. *Id.*

### 8.      Involvement of Winter's Stepdaughter

Defendants assert that Churchill has carried through on his threat to involve Winter's stepdaughter, Patricia Winter, pointing to the undisputed fact that she subsequently filed suit against Winter. *Id.,* No. 59.  Winter and Patricia Winter had a troubled relationship after Winter's husband passed away, but beginning July 2003, the two had started to talk again and were beginning to mend their relationship.  Defendants' Separate Statement (Plaintiff's Motion), No. 32.  Defendants assert that Patricia Winter and Churchill have met and conspired to wrest control of Winter Chevrolet from Winter. *Id.*

United States District Court

For the Northern District of California

### 9.       Winter's Medical Symptoms

Winter has testified that she suffers sleepless nights, anger, distress, and has described her anxiety as feeling like she might have a heart attack.  Joint Statement (Plaintiff's Motion), No. 61.  In January 2004, while seeking treatment from her physician, Winter discovered that she has high blood pressure and that her blood pressure has worsened since her last consultation with her physician.  *Id.*, No. 62.  Winter experienced palpitations in one of her heart valves and she felt tingling in her fingers.  *Id.*, No. 63.  On January 15, 2004, Winter sought treatment from her doctor, Dr. Bernard Wolf, M.D., regarding her continued emotional distress.  *Id.*, No. 64.  On February 5, 2004, Winter sought treatment from her physician again.  *Id.*, No. 65.

### 10.      2003 Bonus and Vacation Days

When Churchill's employment with Winter Chevrolet ended, he was not paid any portion of the annual bonus for 2003 specified in the 2003 Employment Agreement.  He was, however, paid for thirteen days of unused vacation time.  Joint Statement (Defendants' Motion), No. 101.  Both parties assert that the vacation pay was miscalculated: Defendants assert that Plaintiff was erroneously paid for more days than he was entitled to, and that when a number of "incentive trips" that should have been counted as vacation days were taken into account, Plaintiff was entitled to only four days of unused vacation when he left.  Motion at 25.  Plaintiff, on the other hand, asserts that it was Defendants' policy not to include incentive trips as vacation days and that the bookkeeper used the wrong formula to calculate the rate of pay for vacation days, including failing to take into account Plaintiff's previous year's bonus.  The parties agree that during the time Churchill worked for Winter Chevrolet, he accrued 28 days of vacation.  Defendants' Separate Statement (Defendants' Motion), No. 32;  Response to Defendants' Separate Statement (Defendants' Motion), No. 32 (stating that this fact is undisputed).

### B.       Procedural Background

Churchill filed an action against Winter and Winter Chevrolet on February 5, 2004.  He alleged claims for fraud, breach of contract and unpaid wages.  In response, Defendants asserted four counterclaims:

Counterclaim One: Intentional Infliction of Emotional Distress;

United States District Court

For the Northern District of California

1   Counterclaim Two: Breach of Contract;

2   Counterclaim Three: Intentional Interference with Contractual Relations; and

3   Counterclaim Four: Intentional Interference with Prospective Economic Advantage.

4   On February 1, 2005, the Court granted in part and denied in part Plaintiff's motion for summary

5   judgment.  Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment

6   [Docket No. 68], February  1, 2005 ("the February 1, 2005 Order").  The Court dismissed Counterclaim

7   Two with prejudice to the extent that it was based on an allegation that Churchill violated a non-compete

8   provision in his Employment Agreement by accepting employment with Hayward Chevrolet after his

9   employment with Winter Chevrolet ended.  The Court dismissed Counterclaim Three with prejudice on the

10  basis that there was no evidence on which a jury could reasonably conclude that Churchill's alleged

11  comments to strikers caused Defendants to incur any damages.  For the same reason, Counterclaim Four

12  was dismissed with prejudice to the extent it was based on Churchill's statements to strikers allegedly

13  prolonging the strike.  The Court denied summary judgment on Counterclaims Two and Four to the extent

14  the claims were based on Churchill's conduct regarding negotiations to purchase the Pittsburg Ford

15  dealership.  Currently before the Court are two more summary judgment motions, described below.

### 1.      Plaintiff's Summary Judgment Motion

17  Plaintiff seeks summary judgment on Defendants' Counterclaim for Intentional Infliction of

18  Emotional Distress.  Plaintiff argues that the July 7, 2003 conversation in which Churchill threatened to

19  pursue litigation against Winter was absolutely privileged pursuant to California Civil Code § 47(b), which,

20  under some circumstances, affords a privilege to threats of future litigation made in good faith.[6]  Plaintiff

21  points to the fact that he did, ultimately, sue Winter as evidence that he contemplated litigation in good faith.

22  Thus, he argues, California law shields the entire conversation from being used against him in a derivative

23

24  _____

    [6]  Section 47(b) provides that a publication or broadcast is privileged:

25

26  (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding
    authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and

27  reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code
    of Civil Procedure . . . .

28  Cal. Civ. Proc. Code § 47(b).

13

United States District Court

For the Northern District of California

1   tort action. Plaintiff also asserts that as a matter of law, Winter has not suffered severe emotional distress

2   and Plaintiff's conduct was not outrageous.

3          In their Opposition, Defendants argue that summary judgment is improper because the litigation

4   privilege does not apply, and genuine issues of material fact exist.  Specifically, Defendants assert that the

5   litigation privilege does not apply where the threat of litigation is used as a negotiating tactic.  Defendants

6   assert that the threat to file a lawsuit was used to coerce Winter to sign the new employment contract and

7   that Churchill's reference to his "team of lawyers" was not a good faith effort to settle an imminent lawsuit.

8   Also, Defendants claim that there are genuine issues of material fact in regard to the elements for emotional

9   distress.

10                      **2.     Defendants' Summary Judgment Motion**

11         Defendants assert that they are entitled to summary judgment on all of Plaintiff's claims.  First, they

12  argue that the breach of contract claim fails because, in refusing to sign the August 27 Agreements – which

13  Defendants assert fulfilled all of the requirements of the General Manager Pay Plan, Churchill himself

14  committed a breach of contract.  For the same reason, Defendants argue, Defendants did not breach any

15  promise to Churchill.  Second, Defendants argue that Churchill's fraud claim fails because he has not

16  presented evidence sufficient to create a material issue of fact that: 1) Winter made a material

17  misrepresentation of fact or concealed a material fact; 2) Winter made any material statements with intent to

18  deceive; 3) Churchill justifiably relied; and 4) Churchill sustained out-of-pocket losses as a result of any

19  alleged misrepresentation.  Third, Defendants assert that Churchill's wage claim fails because he was

20  actually overpaid for vacation time and he is not, as a matter of law, entitled to recover his unpaid 2003

21  bonus, having failed to complete the year.

22         In his Opposition, Plaintiff asserts that his failure to sign the August 27 Agreements did not breach

23  the contract because those Agreements diverged from the General Manager Pay Plan in several respects.

24  In particular, Plaintiff asserts that the Agreements were inconsistent with the General Manager Pay Plan

25  because: 1) they started the four year period relating to stock purchases all over again, "wiping out the

26  period from February 28, 2000 to October 1, 2001 (the effective date specified in the August 27

27  Agreements); 2) they restricted the buy/sell agreement to Winter's death, rather than death *or* disability, as

28  provided in the General Manager Pay Plan; and 3) the buy/sell agreement required Churchill to pay the

United States District Court

For the Northern District of California

future value of the shares rather than the 2000 appraised value in the event of Winter's death.  Plaintiff also points to deposition testimony by Dawe in which Dawe allegedly states that Joseph withdrew the August 27 Agreements.[7]

With respect to the fraud claim, Plaintiff asserts that there is sufficient evidence from which to conclude that Winter made false statements, with intent to deceive and that because Churchill justifiably relied on these statements, he sustained damages.

With respect to the unpaid wages claim, Plaintiff seems to argue that he was constructively discharged rather than terminated, so he was entitled to his 2003 bonus.  He also asserts there is a fact question based on evidence that 5 percent of Churchill's monthly bonus was withheld.  Finally, he argues that his vacation pay may have been miscalculated.

## III.     ANALYSIS

### A.     Legal Standard

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In order to prevail, a party moving for summary  judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 323.

### B.     Plaintiff's Motion

Plaintiff asserts that Defendants' claim for intentional infliction of emotional distress fails because: 1) the conduct was not outrageous; 2) Winter did not experience severe emotional distress; and 3) the

---

[7]  Plaintiff also argues that Defendants are not entitled to summary judgment under the doctrine of impossibility.  Because Defendants do not raise this defense, the Court does not address it here.

**United States District Court**

For the Northern District of California

1    conduct at issue is privileged.  Because the Court agrees that, as a matter of law, the conduct at issue is not

2    outrageous, it need not reach the remaining issues.

3         The elements of a cause of action for intentional infliction of emotional distress are: 1) extreme and

4    outrageous conduct by the defendant; 2) intention to cause or reckless disregard of the probability of

5    causing emotional distress; 3) severe emotional suffering; and 4) actual and proximate causation of the

6    emotional distress.  *Agarwal v. Johnson*, 25 Cal. 3d 932, 946 (1979), *overruled on other grounds*,

7    *White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999).

8         In order for conduct to be outrageous it must be "so extreme as to exceed all bounds of that usually

9    tolerated in a civilized community."  *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (citing

10   *Davidson v. City of Westminister*, 32 Cal. 3d 197, 209 (1982)).  The Supreme Court of California has

11   relied on the Second Restatement of Torts for the general proposition that conduct is not outrageous where

12   someone's feelings are hurt from "mere insults, indignities, threats, annoyances, petty oppressions, or other

13   trivialities."  *Cole v. Fair Oaks Fire Protection District*, 43 Cal. 3d 148, 155 n.7 (1987) (quoting

14   Restatement (Second) of Torts § 46 comment d).  Conduct that is outrageous is considered the most

15   offensive, and conduct that is irritating, insulting, or even distressing must "simply be endured without resort

16   to legal redress."  *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1129 (1989).

17        California courts have generally recognized three circumstances where conduct may be deemed

18   outrageous.  First, conduct may be outrageous if the actor abuses a relationship or position which gives him

19   the power to hurt another's interest.  *Id.*  For example, if an employee asserts a claim for intentional

20   infliction of emotional distress against his supervisor or employer, he is entitled to a greater degree of

21   protection than if the parties were strangers.  *See, e.g., Alcorn v. Ambro Eng'g, Inc.*, 2 Cal. 3d 493, 498

22   n.2 (1970) (plaintiff was abruptly fired after the supervisor shouted racial epithets); *Kelly v. General*

23   *Telephone Co.*, 136 Cal. App. 3d 278 (1982) (employer deliberately and falsely accused the plaintiff of a

24   felony).

25        Second, if the actor knows that a person is susceptible to mental distress, because of some physical

26   or mental condition or peculiarity, the actor's conduct may be considered outrageous if he acted

27   intentionally.  *Cole*, 43 Cal. 3d at 155 n.7; Restatement (Second) of Torts § 46 comment f (1965) ("The

28   conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such

knowledge, where it would not be so if he did not know.").  For example, a trier of fact could reasonably conclude that an African American plaintiff is particularly susceptible to emotional distress from racial epithets.  *Alcorn*, 2 Cal. 3d at  498 (reversing a dismissal of an emotional distress claim where the plaintiff's foreman shouted racial slurs in a rude manner before firing the plaintiff because the African-American plaintiff could be viewed as having a general susceptibility to emotional distress from racially discriminatory conduct).  However, the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough to be outrageous.  Restatement (Second) of Torts § 46 comment f.

Third, if an actor acts intentionally and unreasonably, and should know his conduct is likely to result in illness from emotional distress, that behavior can be considered outrageous.  *Cole*, 43 Cal. 3d at 155 n.7; *see also Bowden v. Spiegel, Inc.*, 96 Cal. App. 2d 793, 795 (1950) (reversing a demurrer that was decided in favor of the defendant where the defendant called the neighbor of the plaintiff at eleven o'clock at night to summon the plaintiff for an emergency call, advised the plaintiff to prepare for a terrible shock, and threatened to take her to court if she didn't pay a bill that she did not in fact owe); *Vargas v. Ruggiero*, 197 Cal. App. 2d 709, 721 (1961) (holding that defendant's behavior, screaming at the pregnant plaintiff outside of her house, intentionally entering her house without permission, shouting angrily and loudly, and remaining in her house for several hours, could constitute outrageous conduct reasonably related to plaintiff's resulting miscarriage); *State Rubbish Collectors Ass'n v. Siliznoff*, 38 Cal. 2d 330, 335 (1952) (upholding a judgment granting damages for intentional infliction of emotional distress where the cross-defendant, president of an association of rubbish collectors, summoned the cross-plaintiff to a meeting of the association and, in the presence of an intimidating group of associates, told the cross-plaintiff that if he did not comply with their requests that they would beat him up, destroy his truck, and put him out of business).

Mere profanity or offensive language, even in an employment context, is not outrageous conduct.  *Yurick*, 209 Cal. App. 3d at 1128.  In *Yurick*, the defendant supervisor repeatedly called the plaintiff, who was over forty years old, senile and a liar.  *Id.* at 1119.  The plaintiff claimed that the defendant on numerous occasions said that the plaintiff was a liar and that all people over forty years old were liars.  *Id.* Even though the statements were offensive, the California Court of Appeal granted the motion for summary

1    judgment because the supervisor's conduct could not, as a matter of law, be outrageous.  *Id.* at 1129.

2    Also, there was no evidence showing that the defendant abused his position as the plaintiff's supervisor in a

3    way that would harm the plaintiff's interests.  *Id.*

4          Defendants claim that Churchill's actions, when taken together, constitute outrageous conduct.

5    These actions include Churchill's alleged threats made in the July 7, 2003 conversation, his assistance in

6    finding Jason Kim a job at another dealership and his alleged encouragement of other managers, including

7    Ray Shields, to file charges against Winter Chevrolet with the labor commissioner.[8]  Defendants argue that

8    Churchill acted intentionally when Winter was particularly susceptible to emotional distress because her

9    dealership was going through troubled times.

10         Construing all factual inferences in favor of Defendants, the nonmoving party, Churchill's conduct,

11   as a matter of law, does not amount to outrageous conduct.  In the July 7, 2003 conversation, Churchill

12   resigned and threatened litigation.  Churchill cannot be subject for liability for infliction of emotional distress

13   when he has "merely pursued [his] own economic interests and asserted [his] legal rights."  *Trerice v. Blue*

14   *Cross of California*, 209 Cal. App. 3d 878, 885 (1989) (citing *Kruse v. Bank of America*, 202 Cal.

15   App. 3d 38, 67 (1988)).  While he belittled Winter in her ability to run her business, called her a "little old

16   lady," expressed pleasure in her distress, and used a mocking tone, Churchill's statements are merely insults

17   and indignities.[9]  "[T]here can be no recovery for mere profanity, obscenity, or abuse,  . . . insults,

18   indignities, or threats . . . ."  *Yurick*, 209 Cal. App. 3d at 1128.

19         Nor does the Court find evidence that Churchill may have encouraged some managers to bring

20   claims against Winter Chevrolet with the labor commissioner and assisted Kim in leaving Winter Chevrolet

21   by telling him about a job opening sufficient to create a fact question as to whether Churchill's conduct was

22   outrageous.  First, there is no evidence in the record the charges filed with the labor commissioner were

---

8    Defendants also assert that there are genuine issues of material fact in regards to whether Churchill inflamed the strikers with his comments to them on July 7.  However, the Court already rejected this argument in its February 1, 2005 Order, in which it held that a jury could not reasonably conclude, based on the evidence in the record, that Churchill's statements to the strikers caused actual disruption of the contractual relationship between Defendants and the strikers.  Therefore, the Court does not address that argument here.

9    In fact, Winter testified in her deposition that she didn't understand why Churchill told her to "wipe your tears from your eyes."  Roger's Decl. (Plaintiff's Motion), Ex. 2 (Winter Depo.) at 93 ("And he said to me, 'Go ahead and wipe your tears from your eyes.  Grab a tissue' . . . and I said 'Why is that?'  He said, 'Well, wipe the tears out of your eyes.' And I said, 'I don't know what you are talking about.'").

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   frivolous or brought in bad faith by the individuals who filed them.  Even if Churchill did encourage the other

2   managers to file these claims, the Court finds no case authority suggesting that merely encouraging an

3   individual to pursue his legal rights constitutes outrageous conduct.  Second, the Court finds no authority

4   which indicates that simply telling a coworker about a job opening may be outrageous conduct.

5          Defendants cite *Alcorn* for the proposition that when an actor knows a person may be particularly

6   susceptible to emotional distress, their conduct may rise to the level of outrageousness.  Defendants argue

7   that Winter was particularly susceptible to emotional distress because her dealership was going through

8   troubled times, and Churchill's conduct was outrageous because he acted with such knowledge.  This case

9   is distinguishable from *Alcorn*.  In *Alcorn*, the court noted that the susceptibility of the plaintiff was based

10  on his race, and that in light of the developments in the civil rights movement, the plaintiff was particularly

11  susceptible to distress from racial epithets.  2 Cal. 3d at  499 n.4.  Further, the defendant in *Alcorn* not only

12  verbally abused the plaintiff, he fired him abruptly.  *Id.* at 496.  Here, Winter does not suffer from a physical

13  or mental condition or peculiarity – her stress is from ordinary business problems.  While Winter may well

14  have been distressed by Churchill's conduct during the summer of 2003, the circumstances here are not

15  comparable to the situation in *Alcorn* and are not sufficient to make Churchill's conduct outrageous.

16  Therefore, the Court concludes, as a matter of law, Defendant Winter has failed to establish the existence

17  of a genuine issue of material fact as to an essential factor of her claim for intentional infliction of emotional

18  distress, namely, whether Churchill's conduct was outrageous.

19          **C.      Defendants' Motion**

20                  **1.      Breach of Contract Claim**

21          Defendants assert that Plaintiff's breach of contract claim fails because Churchill himself, by failing

22  to sign the August 27 Agreements, breached the contract between Winter and Churchill, as set forth in the

23  General Manager Pay Plan.  The Court finds that there are material issues of fact on this question and

24  therefore summary judgment is not appropriate.

25          To establish a claim for breach of contract, a plaintiff must prove the following elements: 1) the

26  existence of a contract; 2) performance by the plaintiff or excuse for nonperformance; 3) breach by the

27  defendant; and 4) damages.  *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745

28  (2001).  Further, "it is well settled that a contract includes not only the terms set forth in express words, but

**United States District Court**
For the Northern District of California

in addition all implied provisions indispensable to effectuate the intentions of the parties and carry out the contract, and in the absence of which the contract could not be effectively performed." *Watson Bros. Transp. Co. v. Jaffa*, 143 F.2d 340, 347 (8th Cir. 1944) (citations omitted); *see also Orton v. Embassy Realty Assocs.*, 91 Cal. App. 2d 434, 438 (1949) (citing *Epstein v. Gradowitz*, 76 Cal. App. 29, 32 (1925) for the proposition that "[e]ach party to a contract has a duty to do everything that the contract presupposes that he will do to accomplish its purpose"). Repudiation of a key contract provision operates as a total breach, excusing the other party's performance. Cal. Civ. Code § 1440; *County of Solano v. Vallejo Redev. Agency*, 75 Cal. App. 4th 1262, 1276 (1999).

Here, both parties understood that in order to effectuate the transfer of stock envisioned in the General Manager Pay Plan, legal documents of some sort would have to be drafted. Both parties, therefore, were entitled to assume that the other would cooperate in the negotiation and creation of documents that embodied the terms of the General Manager Pay Plan. Defendants argue that Churchill did not meet this obligation and that, in refusing to sign agreements that satisfied the requirements of the General Manager Pay Plan, Churchill himself breached the original agreement. While there is strong evidence supporting Defendants' position, the Court cannot find, as a matter of law, that Churchill repudiated the original contract because he did not sign the August 27 Agreements.

While the August 27 Agreements were consistent in many respects with the terms of the General Manager Pay Plan, nothing in the General Manager Pay Plan *obligated* Churchill to sign this particular set of documents. Further, it is not evident from the record that the August 27 Agreements were identical to the General Manager Pay Plan, as Defendants assert. For example, it is not evident that the valuation formula for the stock purchase used in the August 27 Agreements, *see* Cliffe Decl., Ex. F (Joseph Depo, Ex. 103) at 3, is consistent with the stock transfer provision in the original agreement, which is based on the 2000 appraised value. Plaintiff also points out that the buy/sell provision in the August 27 Agreements became effective only upon Winter's death, whereas the buy/sell provision in the original agreement included death *and* disability. Given that the August 27 Agreements may or may not have been identical to the General Manager Pay Plan, the Court declines to hold as a matter of law that Churchill breached the original contract by refusing to sign those agreements.

The Court rejects, however, the argument that Plaintiff's refusal to sign the August 27 Agreements

United States District Court

For the Northern District of California

did not amount to a breach of contract because the buy/sell provision in the August 27 Agreements was inconsistent with the provision in the General Manager Pay Plan.  The crucial issue in dispute is whether the buy-sell agreement in the General Manager Pay Plan required Churchill to pay fair market value for corporate stock in the event of Winter's death or disability (as Defendants contend) or if it allowed Churchill to purchase corporate stock for the appraised 2000 value (as Plaintiff contends).  This is an issue of contract interpretation governed by California law.

Under California law, the role of courts in construction of contract language is to determine "what the parties meant by the words they used." *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 38 (1968).  In determining what the parties meant, the court may admit parol evidence if the language of a contract is ambiguous, that is, if the language is "reasonably susceptible" to the interpretation urged. *Winet v. Price*, 4 Cal. 4th 1159, 1165 (1992).  Even if the Court does not, ultimately, conclude that parol evidence is admissible, it should consider relevant parol evidence in making the threshold determination as to whether the language is ambiguous. *Id.*  In other words, the court should interpret a contract "in light of all the circumstances that reveal the sense in which the writer used the words." *Pacific Gas & Electric*, 69 Cal. 2d at 39.  However, parol evidence may not be used to give the words of the contract a meaning to which it is not susceptible. *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965).  Further, a party's undisclosed subjective understanding of the meaning of a contract is irrelevant to determining the meaning of contractual language. *Lenk  v. Total-Western, Inc.*, 89 Cal. App. 4th 959, 970 (2001).

Finally, "words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere in that instrument." *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986).

The dispute here turns on the meaning of the word "appraised" in the General Manager Pay Plan.  The word "appraised" is used three times:

> 6.     Required purchase of 4% after six months employment - terms are 50% down, balance payable over 4 years in equal monthly installments with interest at 7% - at *appraised* value.

> 7.     Buy-Sell Agreement for death, disability or separation from service. Within first four years, Rose buys back stock at David's purchase price. Thereafter at *appraised* value.  David has the right to buy Rose's stock at *appraised* value in the event of her death or disability.  David has the right

United States District Court

For the Northern District of California

1    of first refusal if Rose decides to sell.

2    Cliffe Decl., Ex. A (Winter Depo., Ex. 8) (emphasis added).  Given that neither of the provisions specify

3    that the "appraised value" refers to an "appraised value" at some particular point in time (for example, "the

4    2000 appraised value"), a reasonable reading of these provisions is that "appraised value," as used in all

5    three cases, refers to the appraised value at the time of the purchase at issue.  This reading finds support in

6    the distinction made in paragraph 8 between "David's purchase price" and "appraised value."  If

7    "appraised value" referred to the 2000 appraised value, the distinction between the  "appraised value" and

8    "David's purchase price" would be superfluous because they would be one and the same.

9         Plaintiff does not dispute that the words "appraised value" in the third sentence of the Buy-Sell

10   provision, referring to Churchill's purchase of Winter's stock, mean the appraised value at the time of

11   purchase.  Rogers Decl. (Defendants' Motion), Ex. 5 (Churchill Depo.) at 200.  He argues, however, that

12   the same words refer to the 2000 appraised value when used in the next sentence, with reference to his

13   purchase of Winter's stock.  *Id.* at 201.  In his deposition, Churchill testified, "[t]he only reason why I gave

14   it some different meaning was because of a discussion that Mr. Payne, Mr. Engilis, and I had in a January

15   meeting, where we were going to get an appraisal on the dealership; we were going to base the buy-sell on

16   that appraisal."  *Id.*  Elsewhere in his deposition, Churchill testified that he and Engilis had talked about

17   having a buy-sell provision in the deal with Winter, with a right of first refusal that would offer the option to

18   purchase stock at the current value rather than the future market value.  Rogers Decl. (Defendants'

19   Motion), Ex. 5 (Churchill Depo.) at 136-37.

20        This evidence is insufficient to establish that the words "appraised value," as used in the fourth

21   sentence of the buy-sell agreement only, are reasonably susceptible to Plaintiffs' proposed interpretation.

22   First, Plaintiff concedes that the words "appraised value" in the third sentence of the buy-sell agreement

23   refer to the market price at the time of purchase.  Second, the extrinsic evidence on which Churchill relies –

24   a conversation with Engilis that occurred before the General Manager Pay Plan had been drafted – does

25   not explain why Churchill would attribute different meanings to the same words in a single agreement.  Nor

26   does it explain why Churchill did not discuss his interpretation with Defendants before signing the

27   agreement.  The mere fact that Churchill discussed with Engilis on January 20, 2000 the possibility of a

28   buy-sell agreement with an option to purchase at 2000 prices is not sufficient to show that the words

United States District Court

For the Northern District of California

1   "appraised value" as used in an agreement that was drafted weeks later are reasonably susceptible to the

2   interpretation advanced by Plaintiff.  Rather, the Court concludes, as a matter of law, that these words,

3   throughout the General Manager Pay Plan, clearly referred to the appraised value at the time of purchase

4   and that Plaintiff's interpretation is contrary to the words of the contract.

5               **2.     Fraud Claim**

6         In his complaint, Plaintiff sets forth three theories of fraud.  First, he alleges that Defendants falsely

7   represented to him that he would be compensated in accordance with the first nine provisions of the

8   General Manager Pay Plan, and that in reliance on those representations Churchill resigned from his

9   previous employment and took the job offered by Defendants.  Complaint at 2.  Second, he alleges that

10  even if Defendants did not know at the time they made these representations that they were false, they

11  subsequently learned they were false but concealed this information from Churchill so that he would

12  continue to work for Defendants.  *Id.* at 2-3.  Third, Plaintiff alleges that in 2002 and 2003, Defendants

13  represented that they were willing to enter into two separate agreements – a compensation plan and a buy-

14  sell agreement – when in fact, Defendants had no intention of entering into the buy-sell agreement and were

15  simply promising to do so to induce Plaintiff to sign the compensation plan.  *Id.* at 3.  Plaintiff alleges further

16  that "in consequence of the foregoing, [he] has been deprived of ownership of twenty percent (20%) of the

17  business, to his damage in excess of $5,000,000.00."  *Id.* at 3.  Because Plaintiff is not entitled to benefit-

18  of-the bargain damages on his fraud claim and has not presented any evidence of out-of-pocket losses

19  resulting from the alleged fraud, this claim fails on summary judgment.

20        It is well settled under California law that the measure of damages for fraud, in the absence of a

21  fiduciary relationship, is out-of-pocket rather than benefit of the bargain damages.  *See Fragale v.*

22  *Faulkner*, 110 Cal. App. 4th 229, 236 (2003).  "'The out-of-pocket measure restores a plaintiff to the

23  financial position he enjoyed prior to the fraudulent transaction, awarding the difference in actual value

24  between what the plaintiff gave and what the plaintiff received.'"  *Id.* (quoting *Alliance Mortgage Co. v.*

25  *Rothwell*, 10 Cal. 4th 1226, 1240 (1995)).  In contrast, where the alleged fraud is committed by a

26  fiduciary, the benefit-of-the-bargain measure is used.  "'The benefit-of-the-bargain measure places a

27  defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding

28  him the difference in value between what he actually received and what he was fraudulently led to believe he

23

United States District Court

For the Northern District of California

1    would receive.'" *Id*. (quoting *Alliance,* 10 Cal. 4th at 1240).  In *Fragale*, the plaintiffs alleged intentional

2    misrepresentations by their real estate agent and the seller of a house they purchased concerning the

3    condition of the property.  *Id.* at 232.  The court held that while the plaintiffs were entitled to benefit-of-the-

4    bargain damages as to the real estate agent, who was a fiduciary, their exclusive remedy as to the seller

5    (who was not a fiduciary) was out-of-pocket losses.  *Id*. at 237.

6         In the context of intentional misrepresentations by potential employers to induce employees to

7    accept a job, California courts have held that the proper measure of damages is the losses sustained as a

8    result of giving up a previous job, as well as expenses associated with relocation.  *Lazar v. Superior*

9    *Court*, 12 Cal. 4th 631, 648-49 (1996); *see also Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 691

10   (1988) (holding that employer does not owe fiduciary duty to employee).  In *Lazar*, the plaintiff alleged that

11   the defendant induced him to give up his previous employment with promises and representations the

12   defendants knew to be false at the time they were made, including the representations that the company

13   was financially healthy and that the plaintiff could expect to receive substantial annual salary increases if he

14   performed his job.  12 Cal. 4th at 635-36.  The plaintiff accepted the job and moved his family from New

15   York to Los Angeles, where he purchased a house.  *Id.*  Subsequently, the defendant terminated the

16   plaintiff, even though the plaintiff's performance was exemplary, telling him that his job had been eliminated.

17   *Id*. at 636-37.  The plaintiff sued the employer for breach of contract and fraudulent inducement of

18   contract.  *Id*. at 637.

19        The defendants argued that the plaintiff's fraud claim failed on the pleadings, asserting that two

20   previous cases decided by the California Supreme Court, *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174

21   (1993) and *Foley*, 47 Cal. 3d 654, supported the conclusion that a claim for fraudulent inducement of

22   employment contract was no longer viable under California law.  In *Hunter*, the court held that a terminated

23   employee could not recover tort damages for fraud predicated on a misrepresentation used to effect the

24   termination, but left open the question of whether a terminated employee could sue for fraudulent

25   inducement of contract.  *Lazar*, 12 Cal. 4th at 640.  In *Foley*, the Court held that tort remedies are not

26   available for employment terminations that breach the implied covenant of good faith and fair dealing in an

27   employment contract because allowing such recovery would blur the "traditional separation of tort and

28   contract law."  *Id*. at 644 (quoting *Foley*, 47 Cal. 3d at 693).  The court in *Lazar* rejected the defendants'

United States District Court

For the Northern District of California

reliance on *Hunter* and *Foley*, holding that those cases did not restrict the availability of "traditional tort remedies when they are sought in the employment context." *Id.* As a result, the court held, the plaintiff was entitled to recover not only available contract remedies on his breach of contract claim, but also the out-of-pocket damages available on his tort claim. *Id.* at 648-49. Specifically, the court held as follows:

> [A]s to his *fraud* claim Lazar may properly seek damages for the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York. On the facts as pled, however, Lazar must rely on his *contract* claim for recovery of any loss of income allegedly caused by wrongful termination of his employment with Rykoff.

*Id.* (emphasis in original).[10]

Under *Lazar*, Plaintiff here is entitled to recover only the out-of-pocket losses necessary to place him in the position he would have been had the alleged misrepresentations not been made. Thus, he must present evidence that he sustained losses as a result of either leaving Honda of Oakland or failing to accept other employment available to him that would have been more lucrative. Plaintiff has presented no such evidence. Rather, the undisputed evidence indicates that Plaintiff suffered no out-of-pocket losses. He does not dispute that in the 40-month period between February 2000 and June 2003 he received $2,769,648.30 in compensation from Defendants. Joint Statement (Defendants' Motion), No. 103. He also does not dispute that in 1999, his total compensation from Honda of Oakland was $560,450.00.

---

[10] The Court rejects Plaintiff's argument that *Lazar* stands for the proposition that benefit-of-the-bargain damages are available on a fraud claim. In support of this contention, Plaintiff relies on a single sentence, in which the court states that "[b]ecause of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for predictability about the cost of contractual relationships, fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit of the bargain damages." 12 Cal. 4th at 646. Plaintiff's argument is frivolous. It is clear, when read in context, that the court in *Lazar* was referring to the benefit-of-the-bargain damages that are available on *contract* claims. *See Auble v. Pacific Gas & Electric Co.*, 55 F. Supp. 2d 1019, 1023 (N.D. Cal. 1999) (rejecting same argument made by Plaintiff, concluding that "the phrase 'in addition to benefit-of-the-bargain damages' refers to contract damages that were indisputably available to Lazar pursuant to his claim for breach of contract"); *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 242 F. Supp. 2d 720, 730 n.6 (N.D. Cal. 2003), *rev'd in part on other grounds*, (same). The arguments raised in Plaintiff's surreply also have no merit. First, regardless of whether the statement quoted above in *Auble* is dictum, the Court finds no support for Plaintiff's reading of *Lazar* in the case law. Second, the quotation from the decision on appeal in *City Solutions* in which the Ninth Circuit refers to the availability of lost profits for fraud, *see* 365 F.3d at 840, does not suggest anything other than the traditional rule that a fraud plaintiff may recover the profits the plaintiff would have received if the misrepresentation hadn't been made. In this case, that means the profits Plaintiff would have earned if he had either stayed at Honda of Oakland or pursued other opportunities. Nothing in the Ninth Circuit's opinion suggests fraud plaintiffs may recover the profits that would have been received under the contract. Indeed, such a holding would fly directly in the face of *Lazar*.

United States District Court

For the Northern District of California

1    Assuming Churchill would have continued to receive this amount for the ensuing three years if he had

2    remained at Honda of Oakland (a question on which Plaintiff has offered no evidence), he would have

3    received compensation in the amount of $1,868,164 for the same period of time he was employed by

4    Defendants – substantially less than he was paid by Defendants.  While it is possible that Plaintiff *might*

5    have received more than this had he stayed at Honda of Oakland, he has not produced a shred of evidence

6    on this subject.  Nor has he offered *any* evidence that could support a finding that he would have earned

7    more than the $2.7 million dollars he earned from Defendants had he taken a position with another dealer.

8    Therefore, Plaintiff has not shown a genuine issue of material fact on the question of whether he suffered

9    out-of-pocket losses as a result of Defendants' alleged fraud.  Accordingly, Plaintiff's fraud claim fails.

10                        **3.    Wage Claim**

11            Plaintiff seeks to recover unpaid wages pursuant to California Labor Code § 206.  Section 206

12    provides that "[i]n case of a dispute over wages, the employer shall pay, without condition and within the

13    time set by this article, all wages, or parts thereof, conceded by him to be due, leaving to the employee all

14    remedies he might otherwise be entitled to as to any balance claimed."  Plaintiff asserts in his complaint that

15    he is entitled to his 2003 bonus and accrued vacation.  Complaint at 3.  Defendants assert that they are

16    entitled to summary judgment on this claim for two reasons.  First, they argue that, as a matter of law,

17    Plaintiff is not entitled to the annual bonus provided for under the 2003 Employment Agreement because he

18    resigned from his employment with Defendants without completing the year.  Second, Defendants argue

19    that they have already paid Plaintiff for more vacation days than he is owed.  The Court concludes that

20    there are material issues of fact as to both the bonus and the vacation pay.

21            "[W]here a definite bonus or profit-sharing plan has been established and forms part of the

22    employment contract, the employee is not entitled to share in the proceeds where he leaves the employment

23    voluntarily."  *Lucian v. All States Trucking Co.*, 116 Cal. App. 3d 972, 975-76 (1981).  Plaintiff does

24    not dispute this rule applies to the bonus provision in the 2003 Employment Agreement.  Rather, he argues

25    that there is a material issue of fact on whether he left his employment with Defendants voluntarily.  In

26    particular, he asserts that once Winter told him she would not sign any buy/sell agreement, in June 2003,

27    Winter and Winter Chevrolet were in material breach, thereby excusing further performance on Churchill's

28    part.  *See Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 602 (1969).

United States District Court

For the Northern District of California

1      While the Court has held that Churchill was not entitled under the General Manager Pay Plan to a

2  buy/sell arrangement that would have allowed him to purchase the dealership at the 2000 appraised value, it

3  cannot hold as a matter of law that in refusing to sign *any* buy/sell agreement with Chruchill, Winter did not

4  breach the provisions of the General Manager Pay Plan.  Rather, that is an issue of fact for the jury.

5  Therefore, the Court cannot find as a matter of law that Churchill voluntarily left his employment and

6  declines to grant summary judgment on Plaintiff's wage claim on this ground.

7      With respect to the vacation days, the Court is not persuaded that there is a material issue of fact as

8  to whether Plaintiff is entitled to pay for vacation days he did not use.  Rather, the undisputed facts show

9  that Plaintiff was paid for at least the number of vacation days he accrued: 1)  The parties stipulate that

10  during the time Churchill worked for Winter Chevrolet, he accrued 28 days of vacation.  Defendants'

11  Separate Statement (Defendants' Motion), No. 32; Response to Defendants' Separate Statement

12  (Defendants' Motion), No. 32 (stating that this fact is undisputed); 2) When he left Winter Chevrolet,

13  Plaintiff was paid for 13 days of unused vacation time; Joint Statement (Defendants' Motion), No. 101; 3)

14  Plaintiff used at least 15 days of vacation time for vacations that were not incentive trips paid for by

15  manufacturers: November 28 and 29, and December 23 and 24, 2002 (Joint Statement (Defendants'

16  Motion), No. 90); seven days' vacation in August 2002, (*id.*, No 91); a trip to Hawaii between January 2

17  and January 8, 2002, in which Plaintiff attended a wedding and conducted no business activities (*id.*, No.

18  95).

19      There is, however, some evidence suggesting that the vacation pay should have been calculated

20  based on the previous year's salary *including* bonus.  The bookkeeper, Lenore Nelson, testified that she

21  included the bonus in calculating the vacation pay rate for other employees but did not include Churchill's.

22  Rogers Decl. (Defendants' Motion), Ex. 6 (Nelson Depo.) at 31-37. Defendants have not established as a

23  matter of law that Plaintiff is not entitled to vacation pay based on his previous year's salary including his

24  bonus.  Therefore, Defendants are not entitled to summary judgment as to Plaintiff's claim for vacation pay.

25

26

27

28

**United States District Court**
For the Northern District of California

1

**IV.     CONCLUSION**

2          For the reasons stated above, Plaintiff's Motion is GRANTED and Defendants' counterclaim for

3   intentional infliction of emotional distress is dismissed with prejudice.  Defendants' Motion is GRANTED in

4   part and DENIED in part.  In particular, summary judgment is granted as to Plaintiff's claim for fraud,

5   which is dismissed with prejudice.  Summary judgment is denied as to the breach of contract and wage

6   claims.

7          In addition, a scheduling conflict has arisen with respect to the previously scheduled trial date of

8   August 22, 2005.  Accordingly, the TRIAL is continued to **October 24, 2005, at 8:30 a.m.**, for seven (7)

9   days.  THE PRETRIAL CONFERENCE is continued to **October 7, 2005, at 1:30 p.m.**  All deadlines

10  other than those whose schedule is triggered by the dates of the pretrial conference and trial shall remain

11  unchanged.

12         IT IS SO ORDERED.

13

14  Dated: June 9, 2005

15                                               /s/ Joseph C. Spero
                                          JOSEPH C. SPERO
16                                        United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28